5:19mj00056

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Steven W. Duke, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following:

a.   Premises known as 163 Dairy Corner Place, Apartment 2, Winchester, Virginia 22602, hereinafter "PREMISES," further described in Attachment A-1, for the things described in Attachment B-1;

b.   Premises known as 170 Cole Lane, Unit 227, Winchester, Virginia 22602, hereinafter "PREMISES," further described in Attachment A-2, for the things described in Attachment B-1;

c.   Cellular telephone device, hereinafter "DEVICE," assigned telephone number 540-247-5799, a Samsung Galaxy J7 (32GB), serial number 358601090506141, further described in Attachment A-3, for the things described in Attachment B-2;

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since January 2009.  As such, I am a law enforcement officer of the United States within

the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.      I was hired by the FBI as a Special Agent in January 2009, and successfully completed new agent training at the FBI Academy in Quantico, Virginia, in May 2009.  I am currently assigned to the Winchester Resident Agency of the Richmond Field Office.  As a Special Agent of the FBI, I have investigated violations of federal law and have gained experience and knowledge through investigations and training, and from discussions with law enforcement officers with experience and training in investigating violations of federal law.

4.      As part of my duties as a Special Agent, I investigate criminal activity related to a number of federal violations, including mailing threatening communications, in violation of 18 U.S.C. § 876(c), and use of weapons of mass destruction, in violation of U.S.C. § 2332a(a).   My experience includes, but is not limited to, conducting physical surveillance, interviewing witnesses, conducting database checks, analyzing telephone records, writing affidavits for search warrants, executing search warrants, and working with undercover agents and informants.  I have become familiar with matters including, but not limited to, the means and methods used by individuals who utilize the United States Postal Service (USPS) to send threatening communications to others, and the means and methods used by individuals to harm or threaten others with explosive devices.

5.      Through my training and experience, and from discussions with other law enforcement officers, I have become familiar with the methods of operations typically utilized by individuals who seek to evade law enforcement while threatening others via mailed

communications, or evade law enforcement while attempting to harm or threaten others via the use of explosive devices.  I know that such individuals utilize the USPS to conceal their identity from those they threaten.  I am aware that such individuals typically travel to a location away from their residence to place the threatening communication(s) in the mail, and conceal their identity by using fictitious return addresses or by providing no return address.  I am familiar with countermeasures used by such individuals to evade law enforcement identification, such as wearing gloves to prevent fingerprints on the threatening communication and/or explosive device, use of commonly-found stamps, and avoiding hand-written communications.

6.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.       Based on the facts set forth in this affidavit, there is probable cause to believe that violations and/or attempted violations of 18 U.S.C. § 876(c) and 18 U.S.C. § 2332a(a) have been committed by GERALD DRAKE (DRAKE).  There is also probable cause to search the PREMISES described in Attachments A-1 and A-2 for evidence of these crimes as further described in Attachment B-1, and the DEVICE described in Attachment A-3 for evidence of these crimes as further described in Attachment B-2.

## PROBABLE CAUSE

8.       On September 23, 2017, a letter was received, via the USPS, at the visitor's center of the Cedar Creek Battlefield Foundation (CCBF), 8437 Valley Pike, Middletown, Virginia

3

22645.  The letter was sent in an envelope that contained, in the upper-left corner, a printed symbol commonly associated with Antifa.  Online resources describe Antifa as a conglomeration of left wing, autonomous, anti-fascist militant groups who oppose far-right and white supremacist ideologies directly, rather than politically, by employing tactics such as digital activism, property damage, and physical violence.  The Antifa symbol displayed on the envelope (see Figure A) included a black flag and a red flag inside a circle, with the black flag positioned in front of the red flag.

Figure A



9.      Your affiant is aware that this is one of the most common symbols associated with Antifa.  The envelope was postmarked on September 21, 2017, at the USPS's Northern Virginia processing center.  The top of the letter also contained the same printed Antifa symbol displayed on the envelope.  The letter was typed and included threatening language toward the "Cedar Creek Battlefield People."  The writer of the letter stated, "You need to cancel your coming up celebration of the Civil War on October 13, 14, 15, 2017.  If you choose to continue with this farce of history, that clearly celebrates the war to keep African-Americans in chains, than we

4

have no choice but to come and protest.  We will come, and disrupt, and cause problems for all those who attend this atrocity of history.  Several hundred of our supporters will attend, and slash tires, block traffic, harass Patrons, and re-enactors.  We will make Charlottesville look like a Sunday picnic!  Many of us have dogs, so will bring dog feces to throw on people!  We will also throw cups of human urine!  We might resort to actually firing guns into the camps and at the re-enactors!  We will put poison in the water, we will use noise to disrupt the battles and sleep!  These events must stop!  Our local organizer tells us he is ready to go!  You have been warned, now if it is not called off, we will destroy you!  You have less than 1 month to issue a cancellation notice, do it asap!"

10.     On October 14, 2017, the CCBF held the planned battle reenactment at the Cedar Creek Battlefield in Middletown, Virginia.  The annual event has been held since 1990, at the same battlefield on which the Civil War Battle of Cedar Creek was fought.  During the afternoon hours on October 14, 2017, while the battle reenactment was occurring, an unexploded pipe bomb (see Figure B) was discovered in a sutler (Civil War era merchant) tent on the battlefield property.  The pipe bomb was rendered safe by a Virginia State Police (VSP) bomb technician, and turned over to the FBI for processing.  The pipe bomb device was constructed by using a metal pipe nipple, metal nuts glued to the pipe nipple, metal end caps, a 9-volt battery, black and red wires, and a mercury switch.  The inside of the pipe nipple contained smokeless powder and Pyrodex (low explosive ammunition propellants), and BBs.  Despite widespread media coverage of the pipe bomb discovery, your affiant is unaware of any public claims of responsibility by an individual or group.

Figure B



11.     On November 6, 2017, an envelope containing a threatening letter was received by the Gettysburg Times, 1570 Fairfield Road, P.O. Box 3669, Gettysburg, Pennsylvania 17325, sent via the USPS.  The upper-left corner of the envelope contained the same printed Antifa symbol that was displayed on the letter received by CCBF on September 23, 2017.  The envelope was postmarked on November 2, 2017, at the USPS's Northern Virginia processing center.  The top of the letter contained the same printed Antifa symbol displayed on the envelope.  The typed letter contained threats to run over people with trucks, set fires, and have a shooter on a rooftop or a hotel window.  Based on the content and timing of the letter, the threats were made in reference to the Gettysburg Remembrance Day parade scheduled for November 18, 2017.  The writer stated that these threats would be carried out if Confederate flags, or Confederate men and women, were allowed in the parade.  The letter included the statement, "For proof that we did

cedar creek terror attack, the bomb was pipe with end caps, 9 volt battery, mercury switch, epoxy, nuts, BB's."

12.     On November 13, 2017, JOHN BUCHHEISTER (BUCHHEISTER), a resident of Gettysburg, Pennsylvania, who owned and operated a sutler business called The Maryland Sutler, reported to law enforcement that he received a suspicious letter in the mail.  The envelope containing the letter was postmarked on November 2, 2017, at the USPS's Northern Virginia processing center.  The top of the letter contained the same printed Antifa symbol displayed on the letters received by CCBF and the Gettysburg Times.  The letter was typed, and the writer stated, "Thank you so much for putting on Facebook that a teenager was arrested for the threat to Cedar Creek, it was so much easier to bring in a bomb.  Do something like this again for us, we are coming to the Gettysburg Parade and speech.  Thank you again for all your help in the last terror event."

13.     On June 19, 2018, the Winchester Star newspaper, 2 North Kent Street, Winchester, Virginia 22601, printed an article that discussed CCBF's plans to increase security for the 2018 Cedar Creek Battlefield reenactment.  On June 29, 2018, the Winchester Star newspaper received an envelope, via USPS, that contained a threatening letter addressed to "Joe Darezzo."  JOSEPH D'AREZZO (D'AREZZO) was the president of the CCBF Board of Directors (BOD) at that time.  The envelope contained a printed Antifa symbol in the upper-left corner.  The symbol was similar to the symbols displayed on the previous threat letters, but the positions of the red and black flags were reversed from the way they were displayed on the previous letters.  The envelope was postmarked on June 26, 2018, at the USPS's Baltimore,

7

Maryland, processing center.  The top of the letter contained the same printed Antifa symbol displayed on the envelope, with the exception of additional words included on the circle that were not present on the envelope's symbol.  These words were "Antifascist USA" and "Action." (see Figure C)

Figure C



14.     The letter writer threatened to kill D'AREZZO's mother with a car bomb if the 2018 Cedar Creek Battlefield reenactment was not cancelled.  The letter also included methods that could be used to bring weapons and destructive devices into the reenactment grounds.  The writer included the statements, "Don't think metal detectors will help, we have plastic pipe bombs…" and "If you won't stop this celebration of slavery than maybe we need to hurt the participants to stop it instead of just the visitors."  The final line of the letter read, "We are the ones that did it to you last year, we used a bad bomb guy his mercury switch, and rocket launch wire didn't work on the pipe bomb covered in nuts, just so you know we are real and returning." At the bottom of the page, the letter contained a statement that the letter was also sent to Cedar Creek to warn them that they will be attacked again.

15.     On June 29, 2018, the CCBF received an envelope, via USPS, that contained a threatening letter identical to the letter received by the Winchester Star newspaper on June 29,

2018.  The envelope was postmarked on June 26, 2018, at the USPS's Baltimore, Maryland, processing center.

16.     On July 2, 2018, BUCHHEISTER reported to law enforcement that he received another suspicious letter, via USPS, at his residence in Gettysburg, Pennsylvania.  The envelope that contained the letter was postmarked on June 29, 2018, at the USPS's Northern Virginia processing center, and contained a printed Antifa symbol (see Figure D) in the upper-left corner. The top of the letter also contained the same printed symbol.  These symbols were identical to the symbol displayed on the envelope received by the Winchester Star on June 29, 2018.

Figure D



17.     The typed letter was addressed to "Joe", and the writer stated, "Since we can't seem to get you to stop this celebration of a war to keep men in chains, maybe if we go after your volunteers that help out you will stop this.  I like the idea of burning your mother alive in a car bomb."  The writer also made threats to the CCBF visitor's center, stating, "Our many members have suggested we blow up your visitor building, or shoot it up.  I like the idea of burning it to the ground."  Additional statements in the letter mentioned ways to bring weapons into the reenactment event, including, "We now have plastic bombs, so metal detectors are useless!  We have found a man this going to pose as a enactor to drive in some kind of fertilizer bomb.  We have coolers, thermoses, water bottles all made into small IED's."  The final line of the letter

9

read, "To our great friend the Maryland sutler, let everyone know it is going to be a "Blast" at Cedar Creek this fall.  We sent the above letter to them."

18.     Due to the threatening letters, and the pipe bomb discovery in 2017, the CCBF cancelled the 2018 Cedar Creek Battlefield reenactment on July 3, 2018.

19.     On October 2, 2018, the Winchester Star newspaper printed an article titled, "Cedar Creek Battlefield Foundation President, Board Member Resign Over Safety Concerns." The article discussed D'AREZZO's decision to resign as the president of CCBF because he did not believe other board members were taking the threats seriously enough.

20.     On October 10, 2018, an envelope was received at the CCBF visitor's center that contained a threatening letter.  Neither the envelope nor the letter contained any printed symbols. The envelope was postmarked on October 5, 2018, at the USPS's Northern Virginia processing center.  The typed letter was addressed to "Joe D'Arezzo," and referenced his departure from the CCBF board.  The writer stated, "Sorry to see you go.  You were the only one there who knew what we are able to do."  The letter also contained threats to the daughters of JEANNETTE SHAFFER (SHAFFER).  SHAFFER was the acting president of CCBF after D'AREZZO resigned.  The writer stated, "If Jeannette Shaffer thinks she is safe, well she is right, but her children are not!  If she puts together a reenactment to celebrate keeping men in chains, we will come after her girls.  We have a convicted rapist that would love to introduce them to his penis." The writer also threatened to kill specific individuals, stating, "Or we might kill Dr. Stan Hirschberg, or Tim, Pat, or a few volunteers.  It looks like we are going to have to burn the store down, Pat keeps opening it up, or we could just shoot him in the morning."  The writer also made

a reference to SHAWN MOWBRAY (MOWBRAY), stating, "You also have a rat in your place, our information about everything you are or were doing came from him.  Yes, we like real information, but we also hate rats.  You might want to get rid of him.  Shawn Mowbray is your rat.  We will continue to get information from our other friends."  Based on witness interviews, your affiant knows that MOWBRAY is a resident of Frederick County, Virginia, and is a Civil War reenactor.  The letter writer also made a reference to D'AREZZO's parents, stating, "You and your pretty mother, and bald headed dad are now safe, keep speaking the truth, expose this foundation for what it is, a big bunch of racists."  The final line of the letter read, "We are also looking at fun at Gettysburg if the weather cooperates this year.  Electronics and fuses don't work well in rain."

21.     On November 5, 2018, the office of the mayor of Gettsyburg, Pennsylvania, opened an envelope that the office received, via USPS, on November 2, 2018.  The envelope was postmarked on October 31, 2018, at the USPS's Harrisburg, Pennsylvania, processing center. The upper-left corner of the envelope contained an Antifa symbol that was identical to the symbol displayed at the top of the letter received by the Winchester Star on June 29, 2018.  The envelope contained a letter that included the same printed symbol at the top.  The typed letter was addressed to "Gettysburg Parade organizers."  The letter read, in full, "Last year it rained so much we decided to pass on blowing up bombs, driving over people, and slashing viewers with knives.  Our new idea is we are going to put bombs into stores to disrupt this celebration of a war to keep men in chains.  Cancel the flying of the confederate flags and post it on Facebook, then we will leave you alone.  Don't and someone is going to die."

22.     After reviewing the contents of the aforementioned threatening letters with members of the CCBF BOD, and reviewing board meeting minutes, your affiant determined there was information in the 2018 threat letters that was specifically discussed at CCBF board meetings in 2018.

a.   At the CCBF board meeting on April 29, 2018, the board decided to prohibit spectators from bringing backpacks into the 2018 Cedar Creek Battlefield reenactment event. SHAFFER advised your affiant that the board decided a limited number of items would be allowed, such as diaper bags and purses.  The threat letter received by the Winchester Star on June 29, 2018, specifically noted that a diaper bag could be used to bring a destructive device into the reenactment.

b.   At CCBF board meetings on November 5, 2017; March 3, 2018; and April 29, 2018, the board discussed the option of only allowing invited spectators to attend the 2018 Cedar Creek Battlefield reenactment.  In interviews, CCBF board members stated that the plan to deny access to the general public was not publicly announced by CCBF.  The threat letter received by the Winchester Star on June 29, 2018, warned that, "If you won't stop this celebration of slavery than maybe we need to hurt the participants to stop it instead of just the visitors."  In the threat letter received by BUCHHEISTER on July 2, 2018, the writer warned that, "Since we can't seem to get you to stop this celebration of a war to keep men in chains, maybe if we go after your volunteers that help out you will stop this."  CCBF board members advised your affiant that these threats suggested the writer of the letters was familiar with their plan to close the event to members of the general public.

12

c.   At the CCBF board meeting on March 3, 2018, the board discussed the option of

hiring private security for the 2018 Cedar Creek Battlefield reenactment event.  The board also

discussed the possibility of having the Frederick County, Virginia, Sheriff's Office (FCSO) assist

with security at the event.  SHAFFER advised your affiant that the board asked FCSO to provide

hand-held metal detectors for use at the 2018 reenactment.  In the letter received by

BUCHHEISTER on July 2, 2018, the writer stated, "We now have plastic bombs, so metal

detectors are useless!"  When interviewed, two board members advised your affiant that the

potential use of metal detectors was discussed at a board meeting in 2018, and they believed the

writer of the threat letter seemed to be familiar with their plan to use the metal detectors.

23.     In the threatening letter received by the CCBF on October 10, 2018, the writer

threatened to kill specific individuals, stating, "Or we might kill Dr. Stan Hirschberg, or Tim,

Pat, or a few volunteers."  Based on witness interviews, your affiant learned that the individual

identified as "Tim" is not publicly associated with the CCBF as a board member or employee.

This individual worked as a volunteer at the CCBF visitor's center in 2018.  When interviewed,

multiple CCBF board members stated that the writer of the letter seemed to be familiar with the

daily operations of the visitor's center during 2018, based on the identification of "Tim" in the

letter.  Based on interviews and a review of CCBF records, your affiant is aware that the CCBF

is a small organization with one full-time employee, twelve members of the BOD, and a small

number of volunteers.

24.     In the letter received by CCBF on October 10, 2018, the writer mentioned that

"Pat" continued to open up the CCBF visitor's center store, despite the previous threats to burn it

13

down.  PATRICK KEHOE (KEHOE) is the CCBF's only full-time employee, and he was

responsible for operating the visitor's center during the summer months of 2018.  KEHOE

advised your affiant that very few people were aware that he opened the CCBF visitor's center

building, on a limited basis, after the threats received in late June 2018.  One of the individuals

who was aware that KEHOE continued to open the visitor's center on a limited basis was

GERALD DRAKE (DRAKE).  KEHOE provided this information to DRAKE at a Civil War

Roundtable meeting in Winchester, Virginia, on October 4, 2018.

      25.     The reference to MOWBRAY in the letter received by CCBF on October 10,

2018, was discussed during multiple witness interviews.  In that letter, the writer stated, "You

also have a rat in your place, our information about everything you are or were doing came from

him.  Yes, we like real information, but we also hate rats.  You might want to get rid of him.

Shawn Mowbray is your rat.  We will continue to get information from our other friends."

Multiple witnesses, including MOWBRAY, stated that MOWBRAY was a volunteer worker at

the CCBF visitor's center building renovation in 2014, but has not been directly affiliated with

CCBF, in any capacity, since that time.  He was not privy to information that was discussed at

CCBF board meetings, and did not spend substantial time at the CCBF visitor's center.

MOWBRAY presented a petition to the CCBF BOD at a meeting on July 29, 2018, and asked

the board to reconsider its decision to cancel the 2018 Cedar Creek Battle reenactment.

Following his presentation of the petition, MOWBRAY left the board meeting and did not

participate in any further discussions with the board.  CCBF board members stated that it was

14

highly unlikely that MOWBRAY could have passed sensitive or private CCBF information to the writer of the threatening letters, even unwittingly.

26.     Multiple individuals interviewed revealed that MOWBRAY was involved in an incident with DRAKE at the 2014 Cedar Creek Battle reenactment.  DRAKE and MOWBRAY both worked as volunteers at the CCBF visitor's center in 2014, and both were members of the same Confederate reenactor unit.  DRAKE and his friend, DARRELL GRIFFITHS (GRIFFITHS), were removed from the reenactment unit after the incident involving MOWBRAY.  The incident occurred when an unknown individual provided anonymous information to DRAKE and GRIFFITHS that their unit commander, DUFFY MILLER (MILLER), planned to sneak into the reenactment without paying the entry fee.  KEHOE advised your affiant that MOWBRAY was later suspected of being the individual who provided the anonymous information.  Based on the information, DRAKE and GRIFFITHS created posters and placed them around the battlefield property and in the CCBF visitor's center.  The posters advertised MILLER's intentions to sneak into the event, and encouraged other reenactors to stop him.  MILLER learned about the posters, became upset, and removed DRAKE and GRIFFITHS from his unit.  After DRAKE and GRIFFITHS were removed from their unit, MOWBRAY continued to participate in the annual Cedar Creek Battle reenactment, including the 2017 event.  However, he did not volunteer to work for CCBF after 2014.  MOWBRAY advised your affiant that he was shocked to learn that his name was included in the threatening letter.  He stated that the 2014 incident with DRAKE and GRIFFITHS was the only time he has been involved in a controversy at the Cedar Creek Battlefield reenactment.

15

27.     CCBF records and multiple witness interviews confirmed that DRAKE worked in the CCBF visitor's center as a volunteer in May and June 2018.  Multiple witnesses advised that DRAKE was very interested in discussions between board members and KEHOE while they were present together in the CCBF visitor's center.  Following the discovery of the pipe bomb in 2017, KEHOE occasionally made jokes about future Cedar Creek events that were similar to the "blast" comment that was made in the letter received by BUCHHEISTER on July 2, 2018. Witnesses observed that DRAKE may have been present in the visitor's center when KEHOE made such jokes.  CCBF records documenting the presence of volunteers in the visitor's center revealed that DRAKE was present with KEHOE on multiple days during May and June of 2018. These events suggest DRAKE may have received information from KEHOE that was later used to draft the threatening letters.

28.     DRAKE has not participated in the battle reenactment at Cedar Creek since he was removed from his reenactor unit in 2014.  However, he volunteered at the Cedar Creek reenactment in 2016 and 2017.  He worked in the reenactor registration tent at the 2017 event, and because he was a volunteer, had access to the entire event.  The reenactor registration tent was located outside the battlefield property, in a large field to the northeast of the battlefield. The registration tent opened on Wednesday, October 11, 2017, and closed at approximately 12:00pm on Saturday, October 14, 2017.  SHAFFER and her daughters volunteered to work in the spectator parking lot for the 2017 event, as they have for several consecutive years.  When interviewed, SHAFFER noted that she is not a close friend of DRAKE, but believed he would

16

definitely be familiar with her daughters because they have volunteered at the past several Cedar

Creek reenactments.

29.     DRAKE had one registered vehicle at the time of the Cedar Creek battle

reenactment in October 2017, a blue 2017 Hyundai Tucson, Virginia license plate number

BLKPWD.  The vehicle color was designated by Hyundai as "Caribbean Blue," and physical

surveillance has revealed that it is a very distinctive shade of blue.  A civilian drone operator

provided the FBI with video footage captured during the Cedar Creek reenactment weekend in

2017.  Surveillance camera video footage from a business near the battlefield property was also

provided to the FBI.  On the drone video footage, a vehicle closely resembling DRAKE's was

observed parked next to the reenactor registration tent during the evening hours on Friday,

October 13, 2017.  SHAFFER confirmed that she observed DRAKE at this registration tent

during the afternoon or evening hours of October 13, 2017.  The business's surveillance camera

footage showed a similar vehicle entered the battlefield property gate at approximately 2:57pm

on Saturday, October 14, 2017.  The drone video footage showed that this same vehicle was

parked inside the battlefield property at approximately 3:10pm.  The pipe bomb was discovered

at approximately 3:40pm.   The reenactor registration tent was taken down at approximately

9:00am on Saturday, October 14, 2017, and registration was moved to the CCBF visitor's center.

The registration closed completely at approximately 12:00pm.  The vehicle observed on the

business's surveillance camera footage, similar in appearance to DRAKE's vehicle, traveled

from the direction of the visitor's center building as it approached the entrance to the battlefield

gate at approximately 2:57pm.

17

30.     In September 2004, DRAKE was an inmate at the jail in Auglaize County, Ohio. On September 14, 2004, the Auglaize County Sheriff's Office submitted a report to the FBI Cleveland Field Office, documenting an incident that occurred in the jail on September 13, 2004. Officers at the jail discovered a series of drawings in the possession of another inmate, who advised that the drawings were made by DRAKE.  DRAKE later confirmed to jail officials that he created the drawings to convince the other inmate that he was familiar with explosives. DRAKE created eight pages of hand-drawn diagrams of explosive devices, including pipe bombs, a grenade, a propane bomb, a Coleman fuel bomb, and a CO2 cartridge bomb.  The pipe bomb diagrams were similar to the pipe bomb discovered at the Cedar Creek Battle reenactment in 2017.  The diagrams created by DRAKE included a mercury switch, gunpowder, BBs added to the gunpowder for additional shrapnel, and a rocket launcher igniter.  Although a rocket launcher igniter was not found with the pipe bomb discovered at Cedar Creek, the threatening letter received by the Winchester Star on June 29, 2018, referenced a "rocket launch wire," and seemed to suggest that the pipe bomb included one.  The Cedar Creek pipe bomb did contain a mercury switch, smokeless powder, and BBs.  The drawings included hand-written instructions on how to manufacture the various explosive devices, and the exact materials that should be used.  DRAKE noted that the pipe nipple should be "black iron" rather than galvanized pipe, which is consistent with the appearance of the pipe nipple used for the Cedar Creek pipe bomb. The instructions for the pipe bomb device included statements that the pipe nipple and end caps should be bought or stolen.  After reviewing the drawings and written instructions, it is your affiant's belief that DRAKE appeared to be familiar with the construction of pipe bombs,

18

precisely how they should be manufactured, and methods the manufacturer could use to avoid

being identified.  These drawings are shown below (see Figure E):

Figure E



Rocket launch - ingnighter for bomb.

Strip bellwire of it's insolation. you want an unbroken tube of insolating plastic.

Bell wire . solid wire

wire pulled out

slip the hollow tube over the exposed ends of the rocket ignighter

Now bend it slightly to fit in bomb fuse hole you might have to make hole bigger

Attach Allagator clips to exposed wire to Swith or power source.

you must keep bare wire from making contact with the steel bomb use tape to insolate it if you have too.

Get a cheap windup Alarm Clock and take off the plastic face. Remove the second hand or snap it off. Soulder or supperglue your Contact wires to the minute and hour hands as shown.



close up view of hands

Bore on end

Bell wire

Side view of hands

Battery 9 volt

Set alarm, when hands meet wires will touch and complet the cercut.

Heat on View of Hands

20



How To reload a ..... )

First you have to obtain a "Inert" or "dummy" Hand granade from a Army Serplus Store or a gun Show. You want to buy the ones with a full trigering device.

Inside view   This is
the triger

next thing is to remove the triger by sliding out the pivit Pin and save all parts.

Then take a stright "Allen wrenc and incert it into Fuse stem and Hammer out old primer.

Clean out all crap in tube and drill a ⅛" hole into end



Pivit Pin

Fuse Stem

Spent Primer

Stright Allen Wrench

1/16"

enlarge to ⅛"

Drive in a new pistol prime with wooden Dowl

Re asemble the triger device to Fuse head.

Cut a peice of fuse long enough to pass all the way thru the Fuse stem and up to the primer seat, and still have enough to patrube out of the stem about an inch or so.

Fuse    Primer

Take a ¼" pipe tap and tap the bottom of the handgranade to acept a pipe plug

Fill garnade ¾ full of 3 F blockpowder, incert triger assembly, cock and put in safety Pin before incerting and you are ready to throw you have about 3-4 seconds before it blows up.

See other Page for Complete drawing

lotion   Triger   for   Bombs




$\frac{1}{2}$ inch  plastic  PVC  Pipe

6" Long

$\frac{1}{2}$" steel ball bering

Speaker wire

Cork that fits in pipe



fray the wire ends to expose
the wire and glue it inside pipe



So wire is 1inch inside Pipe
and run wire down to Battery and Bomb

Put ball bering inside
Pipe and incert Cork
to hold the ball in
Now if box with bomb
In it is moved the ball
will roll and hit the wires
Completing the cercut



Can also subststute a Mercury switch for ball bering
device.



Side view of
35 mm Film can




Fill 3/4 of the
Can with .3F
Blackpowder



Snap on cap




Wrap with
Ducttape



Top view
of can
First wrap



Top view of
Can 2nd wrap
Different Direction



Top view
3rd wrap



Top View
4th wrap



Buy "Cannon fuse"
it is about 1/8" thick
and comes in 10ft. Rolls

Punch a hole in bottom of film can
thru the duct tape and into the  can.
Push in fuse so you feel it in the powder.



use a Ice pick or
a nail to punch the
holes in the cans.

Homemade
M-80's.

very distructive
and Loud!!




# Pi| Bomb's



Pipe Cap
side
View

Pipe cap.
open end
View

Buy or Steal 3/4" pipe caps, you need 2 per bomb. They are usually made of cast iron or steel.

side view of 3/4" by 6 inch. pipe nipple.

you have to buy or Steal a 3/4 inch by 6 inch Pipe nipple called "Black Iron" not Galvinized. Standard thickness only.

Take 1 endcap and Drill a 1/8" Hole thru the endcap.

x-ray type side view
Drill

Top View
Drill hole

Fill pipe 3/4 of the way with 3F Black powder

Screw on other cap by hand very tight do not use any tools to tighten after it has powder in it. it could spark and Blow up

Take the other cap and put it on the pipe real tight!!

you can add BB's with the Gunpowder for additional scrapnel

Stick in fuse thru 1/8 inch hole and cement with weather stripping Glue

(9)



Coleman Propane ~ ik bombs

Take ~ of the 1 pound tanks and tape them together like shown

Coleman Gas for laterns and stoves
1 Pund

Tape   End view
Side view
Tape

Place 1 pipe bomb in the middle of these tanks

←Fuse

Pipe bomb

Coleman liquid fuel bomb

Buy 1 gallon can of fuel

Coleman Fuel
1 Gal

Place and tape pipe bomb under handle

Coleman Fuel
1 Gal.

Turn upside Down and light fuse!!

Both very distructive and volital

Use 2 inch pipe caps and a 2 inch by 6 inch or 8 inch nipple for anti-personal bombs filled with BB's and nails. Use same plans for smal 3/4 inch pipe bombs.

X-RAY VIEW



Fuse



$CO_2$ cartridge ombs

Front view of
Small hole
from gun pin

CROSSMAN
$CO_2$

End after Crush

Crossman and Daisey
Make air rifles that use these.
Get empty ones and drill a
$\frac{1}{8}$" hole in the end for the
fuse.

Fill $\frac{3}{4}$ full with 3F Black powder
incert fuse and Crush end in a
bench vice but do not cut fuse
in half with the crush pressure.

Crush on edge
of vice

get "C" size Rocket engins
try for the 2 stage type without
a Delay in the boster

Dowl Stick     $\frac{1}{4}$ inch Dia.

CROSSMAN $CO_2$

Velosy

Burn
Time

Size     C 6-0     ESTE'S Rocket Motor

Put $CO_2$ bomb in end of engin with fuse touching
Black propellant and Duct tape together. Then tape
a wooden Dowl stick to the rocket engin and bomb.
The Stick should be 20 inchs long. ant $\frac{1}{4}$ inch Diameter.

TAPE

20"

Can be launched like any firework rocket or fired out of a

31.     In 2003, DRAKE was investigated by the St. Mary's, Ohio, Police Department
(SMPD).  DRAKE and his estranged wife lived in Port Huron, Michigan, at the time.  A review
of the SMPD investigative file regarding DRAKE revealed that he was suspected of sending
multiple pieces of correspondence to the Auglaize County (Ohio) Prosecutor.  These items
included a falsified polygraph report; a fabricated statement from his estranged wife that
included a forged signature of the estranged wife, a forged Notary signature, and a forged Notary
stamp; and a fabricated letter from the Port Huron Police Department (PHPD).  The falsified
polygraph report was created using the letterhead of the Michigan State Police (MSP), and
included the majority of the actual polygraph report that was completed by MSP.  Portions of the
report were fabricated, including the statements that DRAKE made during his post-polygraph
interview.  The fabricated letter from the PHPD was created using actual PHPD letterhead, and
was addressed to the Auglaize County Prosecuting Attorney.  The typed letter was written to
appear as though an anonymous member of the PHPD wanted to provide the Auglaize County
prosecutor with additional information that was being withheld by PHPD investigators.  The
letter writer stated that DRAKE's estranged wife had previous problems with child neglect and
lost her daughter for a period of time because of child neglect.  The writer stated that the letter
was put through a Xerox machine, so no efforts should be made to positively identify the writer.
Your affiant believes this statement was made to suggest that no fingerprints would be located on
the letter.  Per the investigative file, the PHPD detective assisting SMPD with the investigation

of DRAKE confirmed that the letter was created by someone outside the PHPD, and did not

include accurate statements regarding DRAKE's estranged wife.

32.      On August 28, 2003, PHPD officers executed a search warrant at DRAKE's

residence in Fort Gratiot, Michigan.  During the search, items were discovered that suggested

DRAKE was responsible for creating the falsified polygraph report and the fabricated statement

from his estranged wife.  A printed copy of the Local & State section of the Times Herald

newspaper of Port Huron, Michigan, dated November 16, 2002, was also located in DRAKE's

residence.  On the left side of the page, an article appeared to document that DRAKE's estranged

wife, SUSAN JO DRAKE, pleaded guilty to first degree child abuse and first degree child

endangerment.  PHPD investigators reviewed the actual Local & State section of the Times

Herald for November 16, 2002, and discovered that the article regarding DRAKE's estranged

wife was not there.  Investigators believed DRAKE removed the actual article on the left side of

the page and replaced it with the fabricated article about SUSAN JO DRAKE.

33.      PHPD and SMPD investigators concluded that DRAKE utilized a computer to

fabricate documents using the actual letterhead of law enforcement and government agencies,

created false statements with forged Notary signatures and stamps, and completely altered a

newspaper page by replacing an actual article with a fabricated article about his estranged wife.

Investigators believed DRAKE participated in these activities as a way to exonerate himself in

the investigation.  Based on the aforementioned investigative conclusions, it is your affiant's

belief that DRAKE could have used similar techniques and methods to produce the threatening

letters described in the preceding paragraphs.  It is your affiant's belief that the Antifa symbols,

29

as well as the content of the letters, may have been used to disguise the writer's true identity and add legitimacy to the threats.

34.     On February 3, 2018, an email was sent from email address csaduck@yahoo.com to JORDAN RYAN (RYAN), a high school student in Virginia.  RYAN confirmed that the email was sent to him by DRAKE.  DRAKE and RYAN worked together as volunteers at the Sky Meadows State Park in Virginia.  While working together on February 3, 2018, RYAN and DRAKE discussed the Civil War reenactment hobby and how participation in it was declining.  DRAKE mentioned to RYAN that he had some "funny" articles on his cellular telephone regarding the 2017 Cedar Creek Battle reenactment.  DRAKE claimed the articles were found on the internet.  The articles were captured as photographs on DRAKE's cellular telephone, and he sent the email to RYAN with the photographs attached to the body of the email.  The photographs appeared to be taken of three different newspaper clippings.  The first newspaper clipping included an actual letter to the editor of the Winchester Star newspaper that was printed in the Winchester Star on October 26, 2017.  The letter to the editor described the events surrounding the Cedar Creek Battle reenactment in October 2017.  The other two articles included in the email appeared to be completely fabricated by erasing actual newspaper articles and replacing them with fake articles.  These articles described events at the 2017 Cedar Creek Battlefield reenactment that never occurred.  The fabricated events included multiple deaths and injuries from pipe bomb explosions and sniper fire.  Investigators have been unable to locate these fabricated articles on the Internet.  Your affiant has reviewed the list of media members who were present at the 2017 Cedar Creek Battle reenactment, and the Associated Press (AP)

writer and photographer identified on these fabricated articles were not included on the media list.

35.    Witness interviews and online research by investigators revealed that DRAKE utilizes the user name "csaduck" for online accounts with Reddit.com and eBay.com.  A review of the online posts of "csaduck" on Reddit.com, and the eBay.com account of "csaduck," revealed that DRAKE is a model rocket enthusiast.  The threatening letter received by the Winchester Star newspaper on June 29, 2018, included a reference to rocket launch wire on the pipe bomb found at Cedar Creek in 2017.  The drawings created by DRAKE while he was in jail in Ohio in 2004 also included a rocket launch igniter.

36.    A review of the online posts of "csaduck" on Reddit.com also revealed an interest in black powder weapons and the creation of black powder loads for weapons used at Civil War reenactments.  In these posts, "csaduck" described his method of using a software program to create labels for these black powder loads that are accurate for the Civil War period.  This post, believed to be made in 2018, suggests that DRAKE remains interested in participating in other Civil War battle reenactments.  His lack of participation in the Cedar Creek Battlefield reenactment, however, suggests that he may have a negative attitude toward the event, possibly due to the incident with MOWBRAY in 2014.  Witnesses familiar with the Cedar Creek reenactment have stated that although DRAKE worked as a volunteer at the 2016 and 2017 reenactments, he has not participated as a battle reenactor since 2014.

37.     Additional online posts by "csaduck" on Reddit.com, revealed that DRAKE is interested in becoming involved with World War II reenactments.  In approximately October 2018, DRAKE posted the statement, "Looking to get into WW2 since Civil War is dying out."

38.     Additional online reviews of Reddit.com posts by "csaduck" revealed that in approximately December 2017, DRAKE posted the statement, "If anyone looks online for the Gettysburg Remembrance Parade on YouTube, the participants in the Parade look as old as the original Civil War Veterans!"  Based on this statement, your affiant believes DRAKE has viewed video footage of the 2017 parade and was aware of the substantial rain that fell during the event.  The rain at the event was mentioned in the threatening letter received by the CCBF on October 10, 2018, and the letter received by the office of the Gettysburg mayor on November 2, 2018.

39.     In November 2018, Sprint provided records indicating it was the service provider for cellular telephone number 540-247-5799 from the date the account was activated, October 9, 2015, until the date the account was cancelled, October 22, 2018.  In January 2019, AT&T Wireless provided records indicating it became the service provider for cellular telephone number 540-247-5799 on October 22, 2018.  Based on witness interviews, DRAKE left a note on the outside door of the CCBF visitor's center in July or August 2018.  The note was addressed to "Pat," and requested information regarding the status of the visitor's center hours.  DRAKE included telephone number 540-247-5799 on the note as his contact information.  KEHOE also provided your affiant with the same telephone number for DRAKE, indicating it was the contact telephone number CCBF had on file for him.  Call data records previously provided by Sprint

indicated telephone number 540-247-5799 was in frequent contact with a telephone number

utilized by DARRELL GRIFFITHS, noted previously to be a close friend of DRAKE.  Call data

records provided by AT&T Wireless indicated similar telephonic contacts after October 22,

2018, suggesting DRAKE continued to use the same telephone number when he changed cellular

service providers.  Based on this information, it is your affiant's belief that DRAKE has utilized

cellular telephone number 540-247-5799 from October 9, 2015, through December 18, 2018.

Consumer Cellular, a reseller and billing provider for AT&T Wireless, provided records on

March 22, 2019.  These records indicated that the cellular device assigned telephone number

540-247-5799 was a Samsung Galaxy J7 (32GB), serial number 358601090506141.  Consumer

Cellular records indicated the subscriber for telephone number 540-247-5799 was GERALD

DRAKE, residence address 163 Dairy Corner Place, Apartment 2, Winchester, Virginia 22602,

and the cellular account was listed as active.

    40.    On January 31, 2019, a search warrant was served on Sprint, requesting

information regarding the cell tower and antenna face (also known as "sectors") through which

communications were sent and received by DRAKE's cellular telephone account between

September 1, 2017 and October 22, 2018.  On February 11, 2019, a search warrant was served on

AT&T Wireless, requesting information regarding the cell tower and antenna face through which

communications were sent and received by DRAKE's cellular telephone account between

October 22, 2018, and December 11, 2018.  The responsive cell-site records provided by Sprint

and AT&T Wireless were analyzed to determine the approximate physical location of DRAKE's

cellular telephone from September 1, 2017, through December 11, 2018.

41.     In July 2019, Google provided records indicating telephone number 540-247-5799 was associated with Google user account 729181418986, which was created on March 10, 2015.  The name listed on this account was GERALD DRAKE, with an email address listed as csaduck@gmail.com.  On August 1, 2019, a search warrant was served on Google, requesting information associated with Google user account 729181418986.  In response, Google provided records which included location data associated with the account.  These records were also analyzed to determine the approximate physical location of DRAKE's cellular telephone from September 1, 2017, through November 30, 2017, and from June 1, 2018, through December 11, 2018.

42.     Physical surveillance, Virginia Department of Motor Vehicles (DMV) records, bank records, and telephone subscriber records have identified DRAKE's residence address as 163 Dairy Corner Place, Apartment 2, Winchester, Virginia 22602.

43.     As described previously, nine threat letters were mailed between September 21, 2017, and December 4, 2018.  Five of these letters were postmarked at the USPS's Northern Virginia processing center, located in Merrifield, Virginia.  Two of the letters were postmarked at the USPS's Baltimore, Maryland, processing center, and the final two letters were postmarked at the USPS's Harrisburg, Pennsylvania, processing center.  Based on the postmark locations and discussions with United States Postal Inspectors, your affiant is aware of the potential geographic regions from which the letters were likely mailed, and that they were likely mailed within one or two days of the respective postmark dates.  The location of the pipe bomb discovery is precisely known in this investigation.  Based on witness interviews, your affiant believes the pipe bomb

34

was placed in the sutler tent within 30 hours of its discovery.  In order to determine whether DRAKE could have mailed each of the threat letters, the approximate locations of DRAKE's cellular telephone were compared to the likely locations that the letters were mailed, during the timeframes in which they were likely mailed.

44.     The first threat letter was postmarked on September 21, 2017, at the USPS's Northern Virginia processing center.

a.   USPS provided your affiant with a map that shows the geographic region that is processed at the Northern Virginia center.  That map is shown below as Figure F.  Per USPS, letters mailed from a post office or public collection box (blue box) within the blue boundaries shown on Figure F will be postmarked at the Northern Virginia processing center.

b.   On Figure F, your affiant added the approximate location of DRAKE's cellular telephone on the dates and times noted, based on the aforementioned cell-site records provided by Sprint.  At approximately 6:33pm on September 21, 2017, DRAKE's cellular telephone was located near Dulles International Airport in Virginia.  This information was corroborated by United States government records that indicated DRAKE boarded an Air France flight at Dulles International Airport on September 21, 2017.

Figure F



c.   Figure F also shows that Winchester, Virginia, and DRAKE's residence, are located within the territory covered by the USPS Northern Virginia processing center.  As the nine threat letters were postmarked in three different states, your affiant believes the writer intended to mail the letters in varying geographical locations in order to increase the difficulty in identifying the writer.  Therefore, although the letter could have been placed in a mailbox near Winchester, Virginia, your affiant believes it is significant that DRAKE traveled over fifty miles from his residence on the date the first threat letter was postmarked.

d.   Figure G shows the location data provided by Google for DRAKE's cellular telephone on September 21, 2017.  The data was provided in Excel spreadsheets as latitudinal and longitudinal coordinates.  The provided data was then uploaded into the Google Earth

application for analysis and visual depiction.  When the data is displayed in the Google Earth application, red "X"s represent location data that was determined by global positioning system (GPS) technology, blue pins represent location data that was determined by Wi-Fi technology, and green pins represent location data that was determined by cellular technology.  Colored circles around each location point represent the display radius for each point, which is an estimated area in which the cellular telephone is believed to be located.  In reviewing the data, your affiant concluded that the cellular points provide a general, approximate location, the Wi-Fi points provide relatively accurate location data, and the GPS points provide extremely accurate location data.  These conclusions were based on comparison of the location data with physical surveillance logs, known geographical and physical features (i.e. roads, businesses, residences, and buildings), known purchase transactions by DRAKE, surveillance video footage, and witness interviews.

Figure G



e. Analysis of the data displayed in Figure G revealed that DRAKE left his residence, traveled east, and arrived in the vicinity of Dulles International Airport. Figure H provides a visual depiction of the location data when the Google Earth application is zoomed in around the Dulles International Airport area.

Figure H



f.    The Google location data points depicted in Figure H are corroborated by the aforementioned Sprint cell-site records and the United States government records that indicated DRAKE boarded an Air France flight at Dulles International Airport on September 21, 2017. The data points shown at 5:25:14pm, 5:25:57pm, and 5:56:00pm suggest DRAKE traveled to an area east of the airport prior to arriving at the airport.  Figure I shows a zoomed in depiction of these points.  Based on these location points, it appears that DRAKE was located in a retail area that included a Kohl's store and a Giant supermarket store.

g.   A Google search for USPS blue box locations and a review of Google Maps images revealed a blue box was located on the sidewalk outside of the Virginia ABC store located between the Giant and the Kohl's.  These locations have been added to the figure by your affiant, and are not part of the Google data or the Google Earth application.

h.   Based on the location data, DRAKE appeared to be within the geographical area covered by the USPS Northern Virginia processing center until his flight departed on September 21, 2017.

Figure I



45.     The second and third threat letters were postmarked on November 2, 2017, at the USPS's Northern Virginia processing center.

a.   Sprint cell-site location data for DRAKE's cellular telephone on November 1, 2017, the day before these letters were postmarked, has been added by your affiant to the USPS geographical boundary map and is depicted in Figure J.

Figure J



b.   Figure K shows the Google location data points for DRAKE's cellular telephone for the entire day of November 1, 2017.  Your affiant has included time stamps for a small number of the data points to provide context to DRAKE's movement, and to allow comparison with the Sprint cell-site records shown in Figure J.

Figure K



c.   Records provided by Wells Fargo bank revealed DRAKE made a credit card purchase at Home Goods, store number 317, on November 1, 2017.  Figure L depicts the Google location records when zoomed in around the Home Goods store located at 20020 Ashbrook Commons Plaza, Ashburn, Virginia 20147.  A Google search revealed this is the location of

Home Goods store number 317.  The credit card purchase records were used by your affiant to corroborate the location data provided by Google for November 1, 2017.

Figure L



d.    A complete review of the location data for DRAKE's cellular telephone on November 1, 2017, revealed it was within the geographical territory covered by the USPS Northern Virginia processing center throughout the day, and DRAKE appeared to travel over fifty miles from his residence on the day prior to the postmark date of the second and third threat letters.  Cell-site location records provided by Sprint, and location records provided by Google,

43

show that DRAKE's cellular telephone was located in the vicinity of Winchester, Virginia, on November 2, 2017.

46.     The fourth and fifth threat letters were postmarked on June 26, 2018, at the USPS Baltimore, Maryland, processing center.

a.   Figure M is a boundary map provided by USPS for the Baltimore center.  Your affiant has added the approximate location of two cell-site data points provided by Sprint for DRAKE's cellular telephone on June 25, 2018, the day before the letters were postmarked.

Figure M



b.   Figure N shows a visual depiction of the Google location data for DRAKE's cellular telephone on June 25, 2018.  The location data included in this figure appears to show that DRAKE traveled from Winchester, Virginia, to Hagerstown, Maryland, and then returned to Winchester, Virginia, on the same day.

Figure N



c.   Figure O shows the Google location data when the Google Earth application is zoomed in around the Hagerstown, Maryland, area.  Your affiant has included time stamps for

45

several of the data points to provide context to the movement of DRAKE's cellular telephone in Hagerstown.

Figure O



d.    A review of Figure O shows that DRAKE appeared to enter the Hagerstown area on Interstate 81 at approximately 1:58pm.  At approximately 2:09pm, he appeared to be traveling east on Wilson Boulevard in Hagerstown.  At approximately 2:12pm, the data shows that

46

DRAKE appeared to turn around and travel west on Wilson Boulevard, ultimately returning to the vicinity of a Hobby Lobby store located at 1580 Wesel Boulevard, Hagerstown, Maryland, at approximately 2:19pm.

e.    Figure P shows the Google location data when the Google Earth application is zoomed in around the area on Wilson Boulevard where DRAKE appeared to turn around at approximately 2:12pm.

f.    Your affiant conducted an internet search for USPS blue boxes in Hagerstown and identified a blue box location at 1000 Brinker Drive, Hagerstown, Maryland.  The approximate location of this blue box is shown in Figure P.  Your affiant believes it is significant that DRAKE appeared to enter Hagerstown, drive past the Hobby Lobby to an area more than three miles away, and then turn around and return to the Hobby Lobby.

Figure P

47



g.   Your affiant observed the USPS blue box located at 1000 Brinker Drive, Hagerstown, Maryland, on September 23, 2019.  A label on the box indicated the daily collection time for the box is 10:00am, and that the label was printed on August 17, 2016.  Discussions with a USPS Postal Inspector confirmed that letters are typically postmarked on the same day that they are picked up from a blue box location.  This information suggests that a letter mailed from this box at approximately 2:12pm on June 25, 2018, would likely get collected at approximately 10:00am on June 26, 2018, and would have been postmarked on June 26, 2018.

48

h.   These data points show that DRAKE's cellular telephone was located in the vicinity of Hagerstown, Maryland, during the afternoon hours on June 25, 2018, and within the geographical territory covered by the USPS Baltimore, Maryland, processing center. Cell-site location records provided by Sprint, and location records provided by Google, show that DRAKE's cellular telephone was located in the vicinity of Winchester, Virginia, throughout the day on June 26, 2018.

47.   The sixth threat letter was postmarked on June 29, 2018, at the USPS Northern Virginia processing center.

a.   Figure Q is a boundary map provided by USPS for the Northern Virginia processing center.  Your affiant has added the approximate location of cell-site data points provided by Sprint for DRAKE's cellular telephone on June 28, 2018, and June 29, 2018, the day before and the day the letter was postmarked.  These data points show that DRAKE's cellular telephone was located in the vicinity of Winchester and Strasburg, Virginia, on June 28, 2018, and in the vicinity of Winchester, Virginia, on June 29, 2018.  Throughout both days, DRAKE's cellular telephone appeared to be within the geographical territory covered by the USPS Northern Virginia processing center.

Figure Q



b.   Figure R shows a visual depiction of the Google location data for DRAKE's

cellular telephone on June 28, 2018.  The location data included in this figure appears to show

that DRAKE traveled from his residence in Winchester, Virginia, to the Cedar Creek Battlefield

near Middletown, Virginia, and then returned to Winchester, Virginia on the same day.  This

data appears to be corroborated by the Sprint cell-site data depicted above in Figure Q.

Figure R



c.   Figure S shows a visual depiction of the Google location data for DRAKE's

cellular telephone on June 29, 2018.  The location data included in this figure appears to show

that DRAKE traveled from his residence to the USPS Post Office located at 340 N Pleasant

Valley Road, Winchester, Virginia, and then returned to his residence.  The data also shows that

DRAKE appeared to be in the Winchester area the entire day.  This data appears to be

corroborated by the Sprint cell-site data depicted above in Figure Q.

51

Figure S



d.   A review of Figures Q, R, and S above appears to show that DRAKE's cellular telephone was located within the territory covered by the USPS Northern Virginia processing center throughout the day on June 28, 2018, and June 29, 2018.

48.    The seventh threat letter was postmarked on October 5, 2018, at the USPS Northern Virginia processing center.

52

a.   Cell-site data provided by Sprint, as well as Google location data, indicated that DRAKE's cellular telephone was located in the vicinity of Winchester, Virginia, throughout the day on October 4, 2018.  This data is partially corroborated by KEHOE's statement that he spoke with DRAKE at a Civil War Roundtable meeting in Winchester, Virginia, on October 4, 2018. Sprint cell-site data for October 5, 2018, provided two data points for the location of DRAKE's cellular telephone.  Both data points, captured at 2:34pm, appear to show that DRAKE's phone was located in the vicinity of Winchester, Virginia.  The location data provided by Google, however, appears to show that DRAKE traveled away from the Winchester area on October 5, 2018.  Figure T shows a visual depiction of the Google location data.

Figure T



b.   A review of the data included in Figure T appears to show that DRAKE departed his residence and arrived in the vicinity of Front Royal, Virginia, at approximately 11:17am.  He departed Front Royal and arrived in in the vicinity of Leesburg, Virginia, at approximately 12:55pm.  He then departed Leesburg, Virginia, and arrived in the vicinity of his residence at approximately 2:01pm.

c.   While in Front Royal, DRAKE appeared to travel to a department store called Rural King, located at 465 South Street, Front Royal, Virginia.  Prior to arriving at this location,

54

however, DRAKE appeared to stop for a few moments on East Main Street.  This segment of his trip is depicted in Figure U.  DRAKE appeared to arrive on East Main Street at approximately 11:25am, and departed East Main Street at approximately 11:31am, arriving in the vicinity of South Street (Va-55) by approximately 11:32am.

        d.   Your affiant conducted an internet search for USPS blue boxes in Front Royal and identified a blue box location at 3 East Main Street and another one at 131 East Main Street.  The approximate locations of these blue boxes are shown in Figure U.  An investigator involved with this investigation observed the USPS blue boxes located on East Main Street on September 23, 2019.  A label on the box located at 3 East Main Street indicated the daily collection time for the box is 3:00pm, and that the label was printed on August 22, 2017.  A label on the box located at 131 East Main Street indicated the daily collection time for the box is 10:00am, and that the label was printed on August 22, 2017.  This information suggests that a letter mailed at approximately 11:30am on October 5, 2018, from the blue box located at 3 East Main Street on October 5, 2018, would likely have been postmarked on October 5, 2018, and a letter mailed at a similar time from the blue box located at 131 East Main street would likely have been postmarked on October 6, 2018.

Figure U

55



e.    After reviewing the location data provided by Sprint and Google for DRAKE's

cellular telephone on October 5, 2018, your affiant concluded that DRAKE appeared to be

located within the geographical territory covered by the USPS Northern Virginia processing

center throughout the day, and traveled to towns away from the Winchester, Virginia, area.

49.    The eighth threat letter was postmarked on October 31, 2018, at the USPS

Harrisburg, Pennsylvania, processing center.

56

a.   Figure V is a boundary map provided by USPS for the Harrisburg processing center.  Your affiant has added the approximate location of several cell-site data points provided by AT&T Wireless for DRAKE's cellular telephone on October 30, 2018.

Figure V



b.   Figure W shows a visual depiction of the Google location data for DRAKE's cellular telephone on October 30, 2018.  Your affiant has included time stamps for several of the data points to provide context to the movement of DRAKE's cellular telephone.  The location data included in this figure appears to show that DRAKE traveled north from his residence in Winchester, Virginia, to Chambersburg, Pennsylvania, traveled south to Hagerstown, Maryland,

and then returned to Winchester, Virginia, on the same day.  This data appears to be corroborated by the AT&T Wireless cell-site data depicted above in Figure V.

Figure W



c.   Figure X shows the Google location data when the Google Earth application is zoomed in around the Chambersburg, Pennsylvania, area.  A review of the data depicted in Figure X shows that DRAKE appeared to arrive in the vicinity of Chambersburg at

58

approximately 12:01pm, traveled around the west side of the town and arrived near the

downtown area at approximately 12:15pm.  DRAKE then appeared to travel east toward

Interstate 81 and appeared to be south of Chambersburg at approximately 12:38pm.

Figure X



d.   Figure Y shows the Google location data when the Google Earth application is

zoomed in around the downtown area of Chambersburg, Pennsylvania.

Figure Y



e.   A review of the location data depicted in Figure Y shows that DRAKE arrived in the vicinity of the Southgate Mall at approximately 12:21pm.  He appeared to remain in this area until approximately 12:28pm, before traveling east toward Interstate 81.

f.   Your affiant conducted an internet search for USPS blue boxes in Chambersburg, Pennsylvania, and identified a box located on the sidewalk in front of the Family Dollar store, 221 Southgate Mall, Chambersburg, Pennsylvania.  On September 9, 2019, an investigator involved with this investigation observed this blue box located at 221 Southgate Mall.  The label

60

on the box indicated the daily collection time was 10:00am, and that the label was printed on

February 24, 2015.  Based on this information, your affiant believes that a letter mailed at this

blue box location at approximately 12:21pm on October 30, 2018, would likely be postmarked at

the USPS Harrisburg processing center on October 31, 2018.

g.   After reviewing the Google location data for DRAKE's cellular telephone on

October 30, 2018, your affiant believes it is significant that DRAKE appeared to travel directly

from his residence to Chambersburg, Pennsylvania, remained in the downtown area near a USPS

blue box for a short period of time, and then departed Chambersburg and traveled south to

Hagerstown, Maryland.

h.   After reviewing these data points your affiant concluded that DRAKE appeared to

be located within the geographical territory covered by the Harrisburg processing center on

October 30, 2018.  A review of AT&T Wireless cell-site data and Google location data revealed

that DRAKE's cellular telephone was located in the vicinity of Winchester, Virginia, throughout

the day on October 31, 2018.

50.   The ninth threat letter was postmarked on December 4, 2018, at the USPS

Harrisburg, Pennsylvania, processing center.

a.   Figure Z is a boundary map provided by USPS for the Harrisburg processing

center.  Your affiant has added the approximate location of several cell-site data points provided

by AT&T Wireless for DRAKE's cellular telephone on December 3, 2018, the day before the

letter was postmarked.

61

Figure Z



b.   Figure AA shows a visual depiction of the Google location data for DRAKE's cellular telephone on December 3, 2018.  Your affiant has included time stamps for several of the data points to provide context to the movement of DRAKE's cellular telephone.  The location data included in this figure appears to show that DRAKE traveled north from his residence in Winchester, Virginia, to Chambersburg, Pennsylvania, traveled south to Hagerstown, Maryland, and then returned to Winchester, Virginia, on the same day.  This data appears to be partially corroborated by the AT&T Wireless cell-site data depicted above in Figure Z.

Figure AA



c.   Figure BB shows the Google location data when the Google Earth application is zoomed in around the Chambersburg, Pennsylvania, area.  A review of the data depicted in Figure BB shows that DRAKE appeared to arrive in the vicinity of Chambersburg, via Interstate 81, at approximately 5:34pm, traveled around the west side of the town, and stopped briefly near the intersection of Warm Spring Road and Lincoln Highway.  DRAKE then appeared to travel

63

back to Interstate 81 via a similar route.  By approximately 6:05pm, DRAKE appeared to be traveling south on Interstate 81, away from Chambersburg.

Figure BB



d.   Figure CC shows the Google location data when the Google Earth application is zoomed in around the intersection of Warm Spring Road (Va-995) and Lincoln Highway (US-30).  At approximately 5:48pm and 5:49pm, DRAKE appeared to be located in the vicinity of Sunnyway Foods, 49 Warm Spring Road, Chambersburg, Pennsylvania.

e.   On September 9, 2019, an investigator involved with this investigation observed the front sidewalk area at Sunnyway Foods and observed a USPS blue box.  The label on the box indicated the daily collection time was 9:30am, and that the label was printed on August 8, 2013. Based on this information, your affiant believes that a letter mailed at this blue box location at approximately 5:48pm on December 3, 2018, would likely be postmarked at the USPS Harrisburg processing center on December 4, 2018.

Figure CC



f.   After reviewing the Google location data for DRAKE's cellular telephone on December 3, 2018, your affiant believes it is significant that DRAKE appeared to travel directly from his residence to Chambersburg, Pennsylvania, traveled to a relatively remote grocery store near a USPS blue box for a short period of time, and then departed Chambersburg and traveled south to Hagerstown, Maryland.  Your affiant also reviewed all of the location data provided by Google, which included the time periods from September 1, 2017, through November 30, 2017, and from June 1, 2018, through December 11, 2018.  The only two times DRAKE appeared to be located in the vicinity of Chambersburg, Pennsylvania, were October 30, 2018, and December 3, 2018, both of which were one day prior to the postmark dates of threat letters.

g.   After reviewing these data points, your affiant concluded that DRAKE appeared to be located within the geographical territory covered by the Harrisburg processing center on December 3, 2018.  A review of AT&T Wireless cell-site data and Google location data revealed that DRAKE's cellular telephone was located in the vicinity of Winchester, Virginia, throughout the day on December 4, 2018.

51.   As previously stated, the pipe bomb discovery occurred at the Cedar Creek Battlefield on October 14, 2017.

a.   A witness who observed the pipe bomb, a very short time after its discovery, advised your affiant that he placed a 911 call at approximately 3:41pm.  Figure DD shows the Google location data for DRAKE's cellular telephone from 3:07pm until 4:10pm, on October 14, 2017.  By comparing the drone video footage and photographs to the Google Earth imagery

included in Figure DD, your affiant has included an approximately location where the pipe bomb was discovered.

Figure DD



b.   In reviewing this location data, your affiant believes it is significant that from approximately 3:07pm to 3:36pm DRAKE appeared to be in the vicinity of, but across a small gravel road from, the sutler tents where the pipe bomb was discovered.  From approximately 3:36pm until 3:46pm, DRAKE appeared to be located on the opposite side of the sutler tent area.

67

This information suggests that DRAKE possibly walked through the sutler tent area and remained near the tents until approximately 3:46pm.

    c.   The data then shows that DRAKE appeared to walk along the small road that traveled northwest away from the sutler tent area.  He remained on this road from approximately 3:46pm until approximately 3:50pm.

    d.   The next data point, provided as 4:06pm, shows that DRAKE was still near the small gravel road, but had returned to the vicinity of the sutler tent area.  Between 4:07pm and 4:09pm, DRAKE appeared to return to his vehicle and exited the battlefield grounds at approximately 4:10pm.  Video surveillance footage from a neighboring business appears to corroborate this movement of DRAKE as he exited the battlefield in his vehicle.

    52.   During physical surveillance conducted on November 8, 2018, DRAKE was observed at a storage unit located at 170 Cole Lane, Winchester, Virginia.  This storage unit was observed to be a part of a large storage facility called Route 7 Self Storage.

    a.   Your affiant reviewed all Google location data provided and determined that DRAKE was located at this storage facility on four occasions: October 11, 2017; June 27, 2018; September 29, 2018; and November 8, 2018.  Your affiant believes it is potentially significant that DRAKE was present at the storage facility three days prior to the Cedar Creek Battlefield reenactment event in 2017.

b.   Records maintained by Route 7 Self Storage identified DRAKE's storage unit number as 227.

c.   On September 24, 2019, an explosives canine search was conducted along the exterior perimeter of storage unit 227.  A positive canine alert was observed by the canine handler during this search.

53.   Based on the information presented in the preceding paragraphs, your affiant believes there is probable cause to believe that DRAKE is responsible for mailing the threatening communications through the USPS, in violation of 18 U.S.C. § 876(c), and attempting and threatening to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a).  Based on my knowledge and experience, and conversations with law enforcement bomb technicians, it is your affiant's belief that the pipe bomb meets the definition of a "destructive device," as defined in 18 U.S.C. § 921(a)(4)(A), in that the device was an explosive bomb.  It is also your affiant's belief that DRAKE attempted and threatened to use a pipe bomb against persons and property within the United States, and the mail or any facility of interstate or foreign commerce was used in furtherance of the offense; such property was used in interstate or foreign commerce or in an activity that affected interstate or foreign commerce; and, the offense, or the results of the offense, affected or would have affected interstate or foreign commerce. The discovery of the pipe bomb and the threats to employ bombs (or other destructive devices) affected and would have affected interstate commerce.  For example, following the discovery of the pipe bomb on Saturday, October 14, 2017, the events scheduled for the following day were cancelled for the

69

general public.  The ability of the sutlers, several of whom traveled to Virginia from other states, to engage in commerce was significantly diminished when the general public was denied access to the scheduled events on Sunday, October 15, 2017.  These sutlers were denied any opportunity to engage in commerce at the Cedar Creek Battlefield reenactment in 2018, due to the complete cancellation of the event.  This cancellation was a direct effect of the threatening letters and the discovery of the pipe bomb.  There is also probable cause to search the PREMISES described in Attachments A-1 and A-2, for evidence of these crimes as further described in Attachment B-1; and search the DEVICE described in Attachment A-3, for evidence of these crimes as further described in Attachment B-2.

## **TECHNICAL TERMS**

54.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

b.   Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

c.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

55.    Based on my training, experience, and research, and from consulting the manufacturer's technical specifications available online at http://www.samsung.com, I know that the DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, GPS navigation device, audio and video player, and provides Internet connectivity via cellular and Wi-Fi technology.  In my training and experience, examining data stored on devices of this type

71

can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

56.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

57.     As described above and in Attachment B-1, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

58.     *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or

years later using forensic tools.  This is so because when a person "deletes" a file

on a computer, the data contained in the file does not actually disappear; rather,

that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being

used by an active file—for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted data in

a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer

has been used, what it has been used for, and who has used it.  To give a few

examples, this forensic evidence can take the form of operating system

configurations, artifacts from operating system or application operation, file

system data structures, and virtual memory "swap" or paging files.  Computer

users typically do not erase or delete this evidence, because special software is

typically required for that task.  However, it is technically possible to delete this

information.

d.  Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

73

59.   *Forensic evidence.*  As further described in Attachment B-1, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic
storage media may provide crucial evidence of the "who, what, why, when,
where, and how" of the criminal conduct under investigation, thus enabling the
United States to establish and prove each element or alternatively, to exclude the
innocent from further suspicion.  In my training and experience, information
stored within a computer or storage media (e.g., registry information,
communications, images and movies, transactional information, records of
session times and durations, internet history, and anti-virus, spyware, and
malware detection programs) can indicate who has used or controlled the
computer or storage media.  This "user attribution" evidence is analogous to the
search for "indicia of occupancy" while executing a search warrant at a residence.
The existence or absence of anti-virus, spyware, and malware detection programs
may indicate whether the computer was remotely accessed, thus inculpating or
exculpating the computer owner.  Further, computer and storage media activity
can indicate how and when the computer or storage media was accessed or used.
For example, as described herein, computers typically contain information that
log computer user account session times and durations, computer activity
associated with user accounts, electronic storage media that connected with the
computer, and the IP addresses through which the computer accessed networks
and the internet.  Such information allows investigators to understand the
chronological context of computer or electronic storage media access, use, and

75

events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to draft a threatening letter, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a

computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

60.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large

volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

61.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICE(S)

62.      It is requested that this warrant permit law enforcement agents to obtain from the person of DRAKE (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including the DEVICE, requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the device(s).  The grounds for this request are as follows:

63.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric pass code or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

64.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.

Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

65.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

66.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

81

67.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

68.     As discussed in this affidavit, your affiant has reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the device(s) subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

69.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the pass code or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours.  Biometric features from other brands carry similar

restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

70.     Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s) found at the PREMISES; (2) hold the device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

71.     The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device(s).  Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.  However, the voluntary disclosure of such information by the aforementioned

person(s) would be permitted under the proposed warrant.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person( s) for the password to any device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## LOCATION OF DEVICE

72.     During physical surveillance in the vicinity of 163 Dairy Corner Place, Winchester, Virginia, on October 1, 2019, your affiant observed a vehicle registered to DRAKE. Your affiant has observed DRAKE in the vicinity of this residence as recently as October 4, 2019.

73.     Based on physical surveillance and analysis of the location data from Google and AT&T Wireless, DRAKE appears to have the DEVICE on or near his person most of the time. Based on this information, and DRAKE's known residence in Winchester, Virginia, your affiant believes the DEVICE will be located within the Western District of Virginia at the time of execution of the requested search warrant.

## CONCLUSION

74.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachments A-1 and A-2, and seize the items described in Attachment B-1; and search the DEVICE described in Attachment A-3, and seize the items described in Attachment B-2.

Respectfully submitted,

/s/ Steven W. Duke
Steven W. Duke
Special Agent
Federal Bureau of Investigation

Received by reliable electronic means and sworn and attested to by telephone on this ⎽⎽⎽⎽⎽⎽ 15th ⎽⎽⎽⎽⎽⎽ day of October 2019.

⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is 163 Dairy Corner Place, Apartment 2, Winchester, Virginia 22602, further described as a white, two-story, farm-style house with a metal roof. 163 Dairy Corner Place is located on a lot southeast of the intersection of Dowell J Circle and Dairy Corner Place. The house is sub-divided into four apartments. When the house is viewed from Dairy Corner Place, there are two front doors on the first floor. The door on the left, when viewed from Dairy Corner Place, is the entrance to Apartment 2. A black number "2" is displayed on the door, and a white "163" is displayed to the right of the door.



1





## ATTACHMENT A-2

*Property to be searched*

The property to be searched is 170 Cole Lane, Unit 227, Winchester, Virginia 22602, further described as a storage unit with a red door, red gutters above the door along the roofline, and beige columns separating the unit from adjacent units.  The red door contains a beige "227" on the upper right corner.  Another "227" is posted in black letters just above the red door.  170 Cole Lane is located approximately one-quarter mile south of the intersection of Cole Lane and Berryville Pike (Va-7).  Unit 227 is one of numerous storage units arranged in ten rows of units, and is located on the fourth row from the left when viewed from Cole Lane.



1





## **ATTACHMENT A-3**

*Property to be searched*

The DEVICE to be searched is a Samsung Galaxy J7 (32GB), serial number 358601090506141, assigned telephone number 540-247-5799.  Agents executing this warrant are authorized to seize the DEVICE wherever it may be located, regardless of whether the DEVICE is inside the PREMISES, including from the person of GERALD DRAKE and/or any vehicle that agents have probable cause to believe that therein GERALD DRAKE has stored the DEVICE.

**ATTACHMENT B-1**

*Property to be seized*

1.　　All evidence and records relating to violations of 18 U.S.C. § 876(c) and 18

U.S.C. § 2332a(a), and those violations involving GERALD DRAKE, including:

　　　a.　Complete and incomplete explosive devices or destructive devices to include

　　　　　remnants of previously functioned devices.

　　　b.　All explosives or explosive materials designated as high explosives, low

　　　　　explosives, blasting agents, consumer pyrotechnics, display pyrotechnics or traces

　　　　　of such materials.

　　　c.　All unmixed chemical powders, liquids, gels, or other organic and inorganic

　　　　　materials that, when combined, can or can be intended to produce an explosive

　　　　　device, destructive device, or explosive material commonly referred to as a

　　　　　Homemade Explosive ("HME").

　　　d.　Packaging or containers of explosives or explosive materials including, but not

　　　　　limited to, tubes, crates, bins, boxes and other containers.  Placards, materials

　　　　　safety data sheets, or other documentation included with the packaging of

　　　　　commercially manufactured explosive materials.

1

e.  Containers used, or intended to be used, to confine or conceal explosives or destructive devices comprised of wood, metal, cardboard, cloth, plastic or other inorganic material.  Pipe nipples, end caps, or end plugs made from wood, metal, cardboard or plastic.  Compressed gas containers, ordnance containers (i.e. grenade hulls) and other improvised containers.

f.  Fusing and/or firing materials to include, but not limited to, commercially manufactured or improvised pyrotechnic fuse, safety fuse, quick match, Visco fuse, cannon fuse of any color, electric match, or other improvised fusing materials.  Filaments, flash bulbs, rocket motor fuses, blasting caps, electric or electronic detonators and their related wiring (comprised of copper, aluminum, or other metals), dual conductor wire, single and multi-strand wires, tape, wire connectors, shrink tube relays, switches, improvised switches, batteries and/or other power sources.

g.  Switches or device "trigger mechanisms" to include, but not limited to, temperature, infrared, motion, trip wire, barometric pressure, light sensing, dark sensing, or sound.  Command wire or other command operated switches such as pagers, modems, cordless telephones, cellular telephones, key fobs, remote control vehicle or other radio frequency (RF) switches, time delay (microprocessor, digital IC, mechanical, resistors and capacitors) and all safe arm

delay components.  Improvised delay systems such as cigarettes or matches/ lighters.

h.  Tools commonly used in the manufacture of destructive devices including, but not limited to, glues and adhesives, tape, cutting devices, pliers, vices, containers, glues, glue guns and their related adhesives.  Vices, pliers, grinders, drills, drill bits, screw drivers, mallets, hammers, wrenches, dies, cutting implements, soldering irons, circuit testers, pipe cutters and dies, wire cutters and crimpers.

i.  Implements and tools that may contain the residue of explosives or explosive chemicals such as miscellaneous trash, waste bins, barrels, bags, bowls, glassware, spoons, funnels, strainers, mixing implements, vacuums (and their bags) and personal protective gear such as clothing materials, face shields, glasses, plastic suits, gloves and respirators.

j.  Projectiles and related materials added as shrapnel to explosive or destructive devices to include, but not limited to, ball bearings, BBs, nuts, nails, tacks, darts, metal fragments, and the components of firearms ammunition.

k.  Documentation related to the purchase, possession, sale, or use of explosives, explosive materials, or destructive devices (including components of such devices) including, but not limited to, pricing sheets, sales receipts, bills of lading,

3

price tags, or logs.  Currency in the form of cash, check, money order, or other real and tangible proceeds or assets from the sale or intended purchase of explosive materials or destructive devices.

l.  Manuals or other literature relating to the assembly, manufacture and/or function of explosives or explosives device including, but not limited to, books, pamphlets, drawings, sketches, diagrams, photographs, or photocopies whether contained on paper in handwritten form, typed, photocopied or printed or stored on computer printouts, magnetic tape, cassette, disk, diskette, photo-optical devices, faxes, photographic film or any other medium.

m.  Records and information relating to the e-mail accounts csaduck@gmail.com and csaduck@yahoo.com.

n.  Records and information related to Cedar Creek Battlefield Foundation, any current or former members of the Cedar Creek Battlefield Foundation, Cedar Creek Battle Reenactment, Gettysburg Remembrance Day parade, the Winchester Star, the Gettysburg Times, Shawn Mowbray, and/or John Buchheister.

o.  Records and information related to Antifa, to include symbols, literature, and photographs.

    p.   Office supplies used to draft and mail correspondence, including printers, copy machines, scanners, printer paper, envelopes, and stamps.

    q.   Records which provide information regarding the physical location of GERALD DRAKE between September 1, 2017, and December 11, 2018, including receipts, notes, photographs, videos, bank statements, and calendars.

    r.   Records of communications between GERALD DRAKE and any co-conspirators.

2.    Computers or storage media used as a means to commit the violations described above, including mailing threatening communications, in violation of 18 U.S.C. § 876(c), and attempted use of weapons of mass destruction, in violation of U.S.C. § 2332a(a).

3.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

5

b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

6

    j.   documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

    k.   records of or information about Internet Protocol addresses used by the

COMPUTER;

    l.   records of or information about the COMPUTER's Internet activity, including

firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

web pages, search terms that the user entered into any Internet search engine, and

records of user-typed web addresses;

    m.  contextual information necessary to understand the evidence described in this

attachment.

4.       Routers, modems, and network equipment used to connect computers to the

Internet.

As used above, the terms "records" and "information" includes all forms of creation or

storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,

videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, cellular telephones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**ATTACHMENT B-2**

*Property to be seized*

1.      All evidence and records relating to violations of 18 U.S.C. § 876(c) and 18 U.S.C. § 2332a(a), and those violations involving GERALD DRAKE, including:

   a.   Documentation related to the purchase, possession, sale, or use of explosives, explosive materials, or destructive devices (including components of such devices) including, but not limited to, pricing sheets, sales receipts, bills of lading, price tags, or logs.

   b.   Manuals or other literature relating to the assembly, manufacture and/or function of explosives or explosive devices.

   c.   Records and information relating to the e-mail accounts csaduck@gmail.com and csaduck@yahoo.com.

   d.   Records and information related to Cedar Creek Battlefield Foundation, any current or former members of the Cedar Creek Battlefield Foundation, Cedar Creek Battle Reenactment, Gettysburg Remembrance Day parade, the Winchester Star, the Gettysburg Times, Shawn Mowbray, and/or John Buchheister.

   e.   Records and information related to Antifa, to include symbols, literature, and photographs.

1

f.  Records which provide information regarding the physical location of GERALD

DRAKE between September 1, 2017, and December 11, 2018, including

electronic receipts, notes, photographs, videos, electronic bank statements, and

calendars.

g.  Records of communications between GERALD DRAKE and any co-conspirators.

h.  evidence of who used, owned, or controlled the DEVICE at the time the things

described in this warrant were created, edited, or deleted, such as logs, registry

entries, configuration files, saved usernames and passwords, documents, browsing

history, user profiles, email, email contacts, "chat," instant messaging logs,

photographs, and correspondence;

i.  evidence of software that would allow others to control the DEVICE, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious

software;

j.  evidence of the lack of such malicious software;

k.  evidence indicating how and when the DEVICE was accessed or used to

determine the chronological context of access, use, and events relating to crime

under investigation and to the DEVICE user;

2

l.   evidence indicating the DEVICE user's state of mind as it relates to the crime
     under investigation;

m.   evidence of the attachment to the DEVICE of other storage devices or similar
     containers for electronic evidence;

n.   evidence of counter-forensic programs (and associated data) that are designed to
     eliminate data from the DEVICE;

o.   evidence of the times the DEVICE was used;

p.   passwords, encryption keys, and other access devices that may be necessary to
     access the DEVICE;

q.   records of or information about Internet Protocol addresses used by the DEVICE;

r.   records of or information about the DEVICE's Internet activity, including firewall
     logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,
     search terms that the user entered into any Internet search engine, and records of
     user-typed web addresses;

s.   contextual information necessary to understand the evidence described in this
     attachment.

3

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.